UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELISA CABEBE, et al.,

          Plaintiffs,

    v.

NISSAN OF NORTH AMERICA, INC.,

          Defendant.

Case No. 18-cv-00144-WHO

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 31

## INTRODUCTION

Plaintiffs bring this action against defendant Nissan of North America, Inc. ("Nissan"), alleging that 2013 and 2014 Nissan Altima vehicles equipped with a 2.5-liter four-cylinder engine in the states of California, New York, and Pennsylvania ("Class Vehicles") contain design and/or manufacturing defects that can cause the continuously variable transmission ("CVT") to malfunction ("CVT Defect"). Plaintiffs contend that Nissan knew of and concealed the CVT Defect and failed to adequately address it in Class Vehicles. They assert a host of claims on behalf of themselves and putative California, New York, and Pennsylvania classes. Nissan moves to dismiss a number of the claims against it. For the reasons discussed below, I GRANT Nissan's motion as to plaintiffs' Pennsylvania fraudulent concealment claim, New York fraudulent omission claim, and New York General Business Law Section 349 claim and DENY Nissan's motion as to all other claims.

## BACKGROUND[1]

### I. THE CVT DEFECT

Nissan manufactures, markets, and distributes automobiles in the United States. First

---

[1] I accept Plaintiffs' allegations in the first amended complaint as true for the purposes of this motion.

Amended Complaint ("FAC") ¶ 1 [Dkt No. 28]. Plaintiffs allege that, beginning in 2012, Nissan knew that the Class Vehicles contained the CVT Defect. *Id.* ¶ 2. The CVT Defect has been documented to occur without warning during vehicle operation, and plaintiffs allege that it poses an "extreme and unreasonable" safety hazard to drivers, passengers, and pedestrians. *Id.* ¶ 3. Class Vehicle owners have reported a significant delay in their cars' response while attempting to accelerate from a stop, merge into freeway traffic, or pass another vehicle. *Id.* This delay in response is typically accompanied with reports of the engine revving while the driver depresses the gas pedal with little to no increase in vehicle speed and the Class Vehicle's CVT "upshifting and downshifting continuously" without settling on a single gear. *Id.* Other Class Vehicle owners have reported "stalling, jerking, lurching, and/or shaking." *Id.*

Plaintiffs allege that even though Nissan became aware of the CVT Defect from "pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders," it did not recall the Class Vehicles to repair the CVT Defect or provide an appropriate solution to customers free of charge, or offer to reimburse the costs Class Vehicle owners have incurred in relation to the CVT Defect. *Id.* ¶¶ 8, 34. Instead, Nissan has issued multiple technical service bulletins ("TSBs") and voluntary service campaigns that have failed to adequately address the CVT Defect. *Id.* ¶ 36.

For example, on or about September 27, 2012, Nissan initiated a voluntary service campaign to "reprogram the Transmission Control Unit ("TCM")" to "improve transmission durability." *Id.* In doing so, Nissan acknowledged that "under certain unique driving conditions," slippage of the CVT belt could result in "a shaking or judder." *Id.* (internal quotation marks omitted). Plaintiffs contend that while Nissan acknowledged the CVT Defect, it did so in a "false and misleading" manner because the defect is not limited to "certain unique driving conditions." *Id.* Further, plaintiffs allege that Nissan has yet to provide an adequate remedy or acknowledge the extent of the CVT Defect. *Id.*

On or about October 7, 2015, Nissan issued a TSB regarding the reprogramming of the TCM to address "a transmission judder (shake, shudder, single or multiple bumps or vibration)." *Id.* ¶ 37. About a month later, on or about November 11, 2015, Nissan issued another TSB to

address the same condition outlining a procedure for replacement of the CVT assembly. *Id.* On or about December 8, 2016, Nissan announced another voluntary service campaign entitled, "December 2016 CVT Update," to reprogram the CVT software. *Id.* ¶ 38. This software update also failed to cure the CVT Defect. *Id.* On or about January 23, 2017, Nissan announced an amendment to its December 2016 CVT Update ("January 2017 CVT Update"). *Id.* ¶ 39. This software update was also inadequate and ineffective in curing the CVT Defect. *Id.* Nissan continues to issue TSBs concerning ongoing problems with the Class Vehicle's CVTs. *Id.* ¶ 40.

Hundreds of Class Vehicle owners have reported to the National Highway Traffic Safety Administration that their cars have experienced the CVT Defect. *Id.* ¶ 42. Customers have reported the CVT Defect in the Class Vehicles to Nissan directly and through its dealers. *Id.* ¶ 44. Plaintiffs allege that Nissan actively concealed the existence and nature of the CVT Defect from plaintiffs and the other putative Class Members at the time of purchase or repair by failing to disclose: (1) any and all known material defects or material nonconformities of the Class Vehicles, including the CVT Defect, (2) that the Class Vehicles and their CVTs were not in good working order, were defective, and were not fit for their intended purpose, and (3) that the Class Vehicles and their CVTs were defective, despite the fact that Nissan learned of the CVT Defect before it placed the Class Vehicles in the stream of commerce. *Id.*

## II. THE CLASS PLAINTIFFS

Plaintiff Elisa Cabebe, a California citizen, purchased a used 2013 Nissan Altima equipped with a 2.5-liter four-cylinder engine from Acura of Concord in Concord, California, in April of 2015. *Id.* ¶ 10. Prior her purchase, she researched the vehicle on the Internet, visited the Nissan Serramonte dealership and viewed example Class Vehicles, inspected the "Monroney" stickers posted on them, and spoke with the dealer sales representative about the vehicle. *Id.* After her purchase, Cabebe began to experience the CVT Defect, including shaking while driving at freeway speeds, a delay in engagement when depressing the gas pedal, a delay in engagement when shifting into drive, and a delay in acceleration when merging onto the freeway. *Id.* ¶ 11. On or about February 23, 2017, with 44,614 miles on her vehicle and within the five years/60,000 miles coverage of her New Vehicle Limited Warranty Powertrain Coverage ("Powertrain

3

1    Warranty"), Cabebe had the January 2017 CVT Update performed on her vehicle.  *Id.*  Cabebe's

2    vehicle continues to experience the CVT Defect despite the update.  *Id.*

3            Plaintiff Hillary Dick, a California citizen, purchased a used 2013 Nissan Altima equipped

4    with a 2.5-liter four-cylinder engine from CarMax in Fairfield California, in or around March of

5    2015.  *Id.* ¶ 13.  Before purchasing the car, Dick conducted Internet research and visited Nissan's

6    Website.  *Id.*  At CarMax, Dick spoke with the sales representative and viewed multiple Altimas

7    (including the window stickers posted on them) from which she chose the vehicle she ultimately

8    purchased.  *Id.*  She also test drove her vehicle and reviewed a Carfax report on the car.  *Id.*  After

9    her purchase, she began to experience the CVT Defect.  *Id.* ¶ 14.  On or about April 6, 2016, with

10   41,712 miles on her vehicle and within the Powertrain Warranty, Dick took her vehicle to Nissan

11   of Vacaville.  *Id.*  The dealership dismissed her concerns and did not perform any CVT related

12   work to service or repair the CVT Defect.  *Id.*  Roughly a year later, on or about April 21, 2017,

13   with 63,912 miles on her vehicle and outside the Powertrain Warranty, Dick returned to Nissan of

14   Vacaville and the January 2017 CVT Update was performed.  *Id.* ¶ 15.  Dick's vehicle continued,

15   and continues, to experience the CVT Defect.  *Id.*

16           Plaintiff Israel Chia, a New York citizen, purchased a used 2013 Nissan Altima equipped

17   with a 2.5-liter four-cylinder engine from Major World Chevy in Long Island, New York, in

18   March of 2015.  *Id.* ¶ 17.  Before making this purchase, Chia researched the vehicle on the

19   Internet, spoke to the dealer sales representative about the vehicle, reviewed the window sticker

20   posted on the vehicle, and conducted a test drive.  *Id.*  Subsequent to his purchase, Chia began to

21   experience the CVT Defect, including shaking and juddering while driving, even at idle, and

22   acceleration delay.  *Id.* ¶ 18.  On or about February 17, 2017 with 58,350 miles on his vehicle and

23   within the Powertrain Warranty, Chia took his vehicle to Rockaway Nissan, in Inwood New York.

24   *Id.* ¶ 19.  Rockaway Nissan diagnosed the excessive vibration as being caused by a worn side

25   engine mount and charged Chia $120.35 for the testing and diagnosis.  *Id.*  Chia replaced the

26   engine mount but continued to experience the same problems.  *Id.*  On or about April 13, 2017,

27   with 62,251 miles on his vehicle and outside of the Powertrain Warranty, Chia returned to

28   Rockaway Nissan, who recommended a valve body replacement, charging Chia $141.21 for the

testing and diagnostic. *Id.* On April 25, 2017, Rockaway Nissan replaced Chia's valve body and reprogramed the TCM, but Chia continued to experience the CVT Defect. *Id.*

Plaintiff Alexandra McCullough, a Pennsylvania citizen, purchased a certified pre-owned 2014 Nissan Altima equipped with a 2.5-liter four-cylinder engine from Fred Beans Nissan of Dolylestown ("Fred Beans") in Doylestown, Pennsylvania, in November of 2016. *Id.* ¶ 21. Prior to purchase, McCullough viewed the window sticker posted on the vehicle, test drove the vehicle, and spoke with the dealer sales representative about the vehicle. *Id.* Shortly after making the purchase, McCullough began to experience the CVT Defect, including shaking and juddering while driving, an unusual buzzing noise while decelerating, and delayed engagement. *Id.* ¶ 22. On December 12, 2016, McCullough took her vehicle to Fred Beans where it appears the December 2016 CVT Update was performed. *Id.* ¶ 23. McCullough continued to experience the CVT Defect after this update, and on May 15, 2017, with 54,150 miles on her vehicle and within the Powertrain Warranty, her vehicle stalled and would not start. *Id.* After some time, she was able to restart her car and drove it to Fred Beans, where the dealer was not able to replicate the problem and took no action. *Id.* McCullough continued to experience the CVT Defect, and on July 1, 2017, with 57,312 miles on her car and within the Powertrain Warranty, McCullough's vehicle once again stalled and would not restart. *Id.* ¶ 24. McCullough had her vehicle towed to Fred Beans, where they replaced the CVT Transaxle Assembly, which did not cure the CVT Defect. *Id.*

Plaintiffs now bring several claims individually and on behalf of putative California, New York, and Pennsylvania classes, representing purchasers and lessees of Class Vehicles. These claims are for violation of California's Consumers Legal Remedies Act ("CLRA"), for Cabebe and Dick individually and on behalf of the putative California class; violation of California's Unfair Competition Law ("UCL"), for Cabebe and Dick individually and on behalf of the putative California class; breach of express warranty, for Cabebe and Dick individually and on behalf of the putative California class; breach of written warranty under Magnuson-Moss Warranty Act, for Cabebe and Dick individually and on behalf of the putative California class; fraudulent omission, for Cabebe and Dick individually and on behalf of the putative California class; violation of New

5

York's General Business Law for Deceptive Acts or Practices, for Chia individually and on behalf of the putative New York class; breach of express warranty, for Chia individually and on behalf of the putative New York class; breach of written warranty under Magnuson-Moss Warranty Act, for Chia individually and on behalf of the putative New York class; fraudulent omission, for Chia individually and on behalf of the putative New York class; violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), for McCullough individually and on behalf of the putative Pennsylvania class; breach of express warranty, for McCullough individually and on behalf of the putative Pennsylvania class; breach of implied warranty of merchantability, for McCullough individually and on behalf of the putative Pennsylvania class; breach of implied and written warranty under Magnuson-Moss Warranty Act, for McCullough individually and on behalf of the putative Pennsylvania class; and fraudulent omission, for McCullough individually and on behalf of the putative Pennsylvania class.  Nissan moves to dismiss all of plaintiffs' claims, except for the California CLRA and fraudulent omission claims.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

## I.    CALIFORNIA UCL CLAIM

The UCL only provides for restitution or injunctive relief.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (citation omitted).  Nissan argues that plaintiffs' UCL claim fails to state a claim because they do not present a viable case for restitution or injunctive relief.  Motion to Dismiss [Dkt. No. 31] 6-8.  Nissan contends that plaintiffs cannot plead a UCL claim based on restitution because they purchased their used vehicles from third parties.  *Id.* at 6-7.  Nissan also argues that Plaintiffs do not seek injunctive relief related to their UCL claim and they lack standing to seek such relief.  *Id.* at 7-8.  I address each argument in turn.

### A.    Restitution

California's UCL defines "unfair" competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising ...." Cal. Bus. & Prof. Code § 17200.  The UCL thus creates "three varieties of unfair competition: practices which are unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 46 Cal.4th 298, 311 (2009).  An "unlawful" business practice is "anything that can properly be called a business practice and that at the same time is forbidden by law." *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 1254 (2009).  To state a claim for a fraudulent business practice, which includes "claims of deceptive advertisements and misrepresentations, . . . it is necessary only to show that members of the public are likely to be deceived." *Id.* at 312 (internal quotation marks and citations omitted).

In alleging a failure to disclose material facts, however, plaintiff must show that the defendant had a duty to disclose those facts. *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1556–57 (2007). A duty to disclose arises only in certain circumstances, including when a defendant "ha[s] exclusive knowledge of material facts not known or reasonably accessible to the plaintiff," "when the defendant actively conceals a material fact from the plaintiff," or "when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." *Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 255 (2011). A misrepresentation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action ...." *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 332 (2011).

Nissan argues that because the Cabebe and Dick bought their vehicles from a third-party and do not allege that Nissan received any money or property as a result of that transaction, they cannot assert a UCL restitution claim. Mot. at 6-7; s*ee Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013) (holding that plaintiff did not plead a plausible claim to restitution under the UCL because she bought vehicle from a third party). In opposition, plaintiffs dispute that a direct transaction between the parties is necessary for a plausible claim to restitution under the UCL. Opposition [Dkt. No. 34] 7-8.

Restitution is the "return [of] money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply*, 29 Cal. 4th at 1144. The conflict between how each party views a properly pleaded UCL restitution claim centers around different interpretations of *Korea Supply*. The plaintiff in that case was a business that represented a military equipment manufacturer in a deal with the Republic of Korea. *Id.* at 1141. The plaintiff alleged that it lost a contract to Lockheed Martin, despite its superior product and lower bid, because Lockheed Martin's agent "offered bribes and sexual favors to key Korean officials." *Id.* The plaintiff sought restitution for loss of the contract through a UCL claim. *Id.* The California Supreme Court rejected the plaintiff's restitution claim, holding that the remedy sought was "not restitutionary because plaintiff [did] not have an ownership interest in the money it [sought] to recover from defendants . . . [and was] . . . not seeking the return of money or

property that was once in its possession." *Id.* at 1149. Plaintiff had not given any money to Lockheed Martin, and "[a]ny award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff." *Id.*

*Korea Supply* has led to divergent conclusions concerning whether a plaintiff who seeks restitution based on the purchase of a used car can properly bring a UCL restitution claim. *Compare Asghari*, 42 F. Supp. 3d at 1324, *with Aberin v. Am. Honda Motor Co.*, 2018 WL 1473085, at *8 (N.D. Cal. March 26, 2018) (holding that *Korea Supply* did not exclude UCL claims for plaintiffs who purchased used vehicles).

California courts have sought to clarify *Korea Supply*. In *Shersher v. Superior Court*, the California Court of Appeal held that *Korea Supply* does not limit UCL restitution claims to direct purchases as a matter of law. 154 Cal. App. 4th 1491, 1498 (2007). "Nothing in *Korea Supply* conditions the recovery of restitution on the plaintiff having made direct payments to a defendant who is alleged to have engaged in . . . unlawful practices under the UCL." *Id.* at 1493. "Rather, the holding of *Korea Supply* on the issue of restitution is that the remedy the plaintiff seeks must be truly 'restitutionary in nature'—that is, it must represent the return of money or property the defendant acquired through its unfair practices." *Id.* at 1494. In *Shersher*, the court reinstated the plaintiffs' UCL restitution claim against Microsoft, even though they had purchased the products at issue from third party retailers. 154 Cal. App. 4th at 1499–500. Further, as I noted in *Johnson v. Nissan N. Am., Inc*., 272 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017), "The court in *Ashgari* merely held that where plaintiff failed to allege that defendant had obtained any funds by virtue of an unfair business practice, plaintiff could not bring a claim for restitution under the UCL."

I find the reasoning in *Shersher* and *Aberin* persuasive. Plaintiffs have alleged that Nissan was unjustly enriched as a result of its allegedly unlawful business practices. *See generally* FAC ¶¶ 77-90. Accordingly, Nissan's motion to dismiss as to plaintiffs' restitution-based UCL claim is denied.

## B. Injunctive Relief

Plaintiffs seek the following injunctive relief: (1) that Nissan provide notice to all current

9

owners or lessees of the Class Vehicles in California, New York and Pennsylvania, offering to replace the allegedly defective CVT with a non-defective CVT; (2) that Nissan provide notice to all current owners and lessees of the Class Vehicles in California, New York and Pennsylvania, extending the warranty for the Class Vehicles' CVT to 10 years with unlimited mileage; and (3) that Nissan "immediately cease the sale and leasing of the Class Vehicles at authorized Nissan dealerships in California, New York and Pennsylvania without first notifying the purchasers of the CVT Defect, and otherwise immediately cease to engage in the violations of law. FAC ¶ 212(a), (b), (d).

Nissan argues that plaintiffs failed to seek injunctive relief related to their UCL claim. Mot. 7-8. Nissan also contends that plaintiffs lack standing seek injunctive relief in this action. *Id.* Though Nissan is correct that plaintiffs fail to seek injunctive relief specifically under the ambit of their UCL claim, in their prayer for relief, plaintiffs seek remedies that are injunctive in nature. I will not dismiss plaintiffs' claim over an unnecessarily technical reading of their complaint and will consider the merits of the injunctive relief sought under the UCL framework and whether plaintiffs may seek injunctive relief generally.

Plaintiffs argue that they have standing to pursue the above described injunctive relief on a number of grounds: (1) "as current vehicle owners[2] who are continuing to suffer from the CVT Defect, plaintiffs Cabebe, Dick, and McCullough have a direct interest in Defendant providing a non-defective CVT and a corresponding warranty extension, and are threatened with irreparable harm if it does not," (2) "as persons sharing the road with other drivers, and as pedestrians, all Plaintiffs (including Mr. Chia) have an interest in ensuring that the Class Vehicles are either operating safely or not placed on the road in the first place," and (3) "as persons who have been deceived in the past, all Plaintiffs have standing because they will be unable to rely on Defendant's representations in the future should they wish to purchase another vehicle." Oppo. 8-9.

In order to establish standing for injunctive relief, a plaintiff must demonstrate that he "has

---

[2] Plaintiffs state that Chia relinquished his vehicle prior to involvement in this litigation due to his ongoing CVT problems. Oppo. 8 n.1.

United States District Court
Northern District of California

suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that [they] will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotation marks and citations omitted). A party seeking injunctive relief under the UCL must still meet the standing requirements of Article III. *See, e.g., Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("[T]here must be a real and immediate threat of repeated injury" to meet the standing requirement for injunctive relief under the UCL.). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a controversy." *Bates*, 511 F.3d at 985. "However, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.* (internal quotation marks omitted).

Rather than address the merits of plaintiffs' first request for injunctive relief, Nissan contends that the requested replacement is better characterized as a request for specific performance rather than injunctive relief. Reply [Dkt. No. 35] 2-3. In Nissan's view, that remedy cannot support a UCL injunctive relief claim. I do not agree. In requesting that Nissan replace the CVT Defect as a form of relief, plaintiffs are clearly seeking a "court order commanding . . . an action." INJUNCTION, Black's Law Dictionary (10th ed. 2014). This remedy can, therefore, be characterized as injunctive relief. Whether plaintiffs have standing to seek such relief is a separate question.

Here, all plaintiffs (except for Chia) allege that their vehicles continue to suffer from the CVT Defect. FAC ¶¶ 11, 15, 24. Plaintiffs further allege that had they known of the CVT Defect, they would not have purchased their vehicles or would have paid less for them. *Id.* ¶ 7. Plaintiffs contend that by relying on Nissan's misrepresentations and omission regarding the Class Vehicles and the CVT Defect, they have suffered "ascertainable loss of money, property, and/or loss in value" of their cars. *Id.* ¶ 9. These allegations are sufficient to allege injury in fact for purposes of Article III and the UCL. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011) (economic injury for purposes of UCL shown where plaintiffs "(1) surrender in a transaction more, or acquire in a transaction less, than [they] otherwise would have; (2) have a present or future property interest diminished; (3) [are] deprived of money or property to which [they have] a

11

cognizable claim; or (4) [are] required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."). Accordingly, all plaintiffs (except Chia) have demonstrated that they have standing to seek injunctive relief, including Cabebe and Dick in the context of a UCL injunctive relief claim. Nissan's motion as to the injunctive relief-based UCL claim is denied.[3]

## II.     NEW YORK CONSUMER PROTECTION STATUTE CLAIM

Nissan argues that Chia's claim under New York's General Business Law § 349 ("Section 349") does not comply with Federal Rule of Civil Procedure 9(b)'s heightened pleaded requirement for claims sounding in fraud. Mot. 8-10. Nissan further contends that Chia does not allege with specificity any materially misleading statement, act, or practice by Nissan. *Id.*

Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. L. § 349(a). In order to state a claim under Section 349, a plaintiff must allege "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 525 (S.D.N.Y. 2003). An act is "consumer oriented" when "the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.E. 2d 741, 744 (N.Y. 1995).

Plaintiffs need not establish justifiable reliance or defendant's intent to defraud or mislead in order to state a claim. *Id.* at 745. New York courts have adopted "an objective definition of deceptive acts and practices, whether representations or *omissions*, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (emphasis added); *see also Solomon v. Bell Atl. Corp.*, 777 N.Y.S. 2d 50, 55 (App. Div. 2004) ("[T]o prevail in a cause of action under GBL §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in plaintiff's

---

[3] Chia's lack of standing does not have a functional effect on this action given the nature of injunctive relief. Accordingly, I will not address whether Chia can demonstrate standing based on plaintiffs' other asserted grounds.

circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury.").

I will assume that the heightened pleading standard in Rule 9(b) applies because the parties agree that it does. Mot. 9; Opp. 6, 10. Although plaintiffs generally allege the existence of these "false and misleading" communications, Chia does not specifically allege that he saw them or that his actions were driven by such communications. Nissan argues that this means that Chia cannot assert the requisite injury for a Section 349 claim. Mot. 9-10. I agree. Chia has failed to allege causation with sufficient specificity. [4] Accordingly, Nissan's motion is granted as to Chia's section 349 claim.[5]

## III. NEW YORK FRAUDULENT OMISSION CLAIM

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). Claims under a fraudulent concealment theory must further allege that the "defendant had a duty to disclose material information." *Nealy v. U.S. Surgical Corp.*, 587 F.Supp.2d 579, 585 (S.D.N.Y. 2008) (citations omitted). A duty to disclose arises in the following scenarios: (1) the parties are in a fiduciary relationship; (2) under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or (3) where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005) (citations and internal quotation marks omitted); *see also Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, 803 (2003)

[4] Chia cites to a number of cases in which the courts allowed a section 349 claim to go forward based on purportedly similar facts. *See, e.g.*, *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 239 (S.D.N.Y. 2015). These cases are inapposite because they do not apply the heightened Rule 9(b) standard.

[5] Nissan argues that Chia has failed to plead a Section 350 claim as well. As Plaintiffs have only referenced Section 350 in the title of the FAC but nowhere else, I find that they have not attempted to state a Section 350 claim.

United States District Court
Northern District of California

("New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair.").

Nissan contends that Chia's fraudulent omission claim fails on three grounds: (1) Chia fails to allege that Nissan had a "duty to disclose"; (2) Chia's fraud claim lacks the required particularity under Rule 9(b); and (3) New York's "economic loss" rule bars the fraud claim. I need not address the second and third grounds because Chia has not alleged a duty to disclose.

Chia argues that he has adequately alleged a duty to disclose under the "special facts" doctrine. Oppo. 13. "Under that doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 (2003). A plaintiff must prove that "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 155 (2nd Cir. 1995) (citations omitted).

Here, Chia alleges that Nissan possessed exclusive knowledge of the CVT Defect, and instead of acknowledging the extent of the defect, Nissan covered up the true nature of the defect. FAC ¶¶ 34-36. He states that Nissan "had and has a duty to fully disclose the true nature of the CVT Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the [CVT] Defect poses an unreasonable safety hazard." *Id.* ¶ 41. But none of Chia's allegations explicitly charge Nissan with knowledge that he, or any other New York consumers, acted on the basis of this mistaken knowledge. For that matter, Chia also does not allege that Nissan knew that Chia and other consumers acted on the basis of mistaken knowledge. He does not satisfy the elements of the "special facts" doctrine.

Chia cites *Wilson v. Comtech Telecommunications Corp.* to argue that as this case is about alleged omissions by Nissan, if he can demonstrate that the omission is material he would satisfy the knowledge element of the special facts doctrine. Oppo. 13 (citing 648 F.2d 88, 92 n.6 (2d Cir. 1981)). *Wilson* is not applicable to this case because it dealt with reliance under a different statute,

14

section 10(b) of the Securities Exchange Act of 1934. Accordingly, I grant Nissan's motion to dismiss Chia's New York law fraudulent omission claim.

## IV. PENNSYLVANIA CONSUMER PROTECTION LAW CLAIM AND COMMON LAW FRAUD CLAIM

### A. The Economic Loss Doctrine

Nissan argues, based on the Third Circuit decision in *Werwinski v. Ford Motor Co*., 286 F.3d 661, 671 (3d Cir. 2002), that McCullough's common law fraudulent omission claim and UTPCPL claim are each barred by Pennsylvania's "economic loss" doctrine. Mot. 8-11. This doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp*., 66 F.3d 604, 618 (3d Cir. 1995).

In *Werwinski*, the plaintiff asserted causes of action for fraudulent concealment under both the Pennsylvania UTPCPL and the common law. *Id.* at 664. The district court found that the economic loss doctrine barred the plaintiff's claims and concluded that no reason existed for treating a common law fraudulent concealment claim differently from a statutory claim raised under the UTPCPL. *Id*. at 665. The Third Circuit affirmed that the economic loss doctrine barred plaintiff's common law fraudulent concealment and UTPCPL claims. *Id*. at 670-82.

McCullough contends that *Werwinski* is no longer good law and the economic loss doctrine does not apply. But, as a district court in the Eastern District of Pennsylvania thoroughly explored in *Powell v. Saint Joseph's Univ*., 2018 WL 994478 at *8-10 (E.D. Pa. Feb. 20, 2018), the Supreme Court of Pennsylvania has not explicitly overturned *Werwinski*. As the *Powell* court reasoned, absent "a clear statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law," *Werwinski* remains the law of the Third Circuit. *Id.* I defer to the Third Circuit's determination of Pennsylvania state law and apply *Werwinski* to McCullough's common law fraudulent omission claim and UTPCPL claim. *See Charter Oil Co. v. American Employers' Ins. Co*., 69 F.3d 1160, 1164 (D.C. Cir. 1995) ("Judges of the home circuit are likely to be more experienced in the law of states within their circuits than are outsiders[.]").

Plaintiffs contend that if *Werwinski* is applied to this action, I should decline to apply the economic loss doctrine because McCullough's claims are not contractual in nature and the "gist of the action doctrine" prevents application of the economic loss doctrine to claims that are "extraneous to the alleged breach of contract, not interwoven with the breach of contract." Oppo. at 17-18 (citing *Burke v. Honeywell Int'l, Inc*., No. CV 15-1921, 2016 WL 1639820, at *8 (E.D. Pa. Apr. 26, 2016)). Plaintiffs argue that because their claims are based on allegedly fraudulent conduct that began prior to McCullough's purchase of her car, her claims do not fall within the ambit of a contract. I agree. Similar to the plaintiffs in *Kantor v. Hiko Energy, LLC*, McCullough has alleged conduct that is distinct from a contract claim. 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015) (applying *Werwinski* and finding that plaintiff's claims arose from representations made prior to the contract and therefore do not flow from the contract). Plaintiffs allege that Nissan concealed material facts that, if known by plaintiffs, would have kept them from buying their Class Vehicles. This conduct precedes any contract between Nissan and McCullough and McCullough's fraudulent omission claim and UTPCPL claim are not barred by the economic loss doctrine. *See id.* Defendant's motion to dismiss the UTPCPL claim and fraudulent omission claim under the economic loss doctrine is denied.

**B. The Fraudulent Concealment Claim**

Nissan also argues that McCullough's fraudulent concealment claim fails because McCullough does not allege that she participated in any transaction with Nissan. Mot. 14. Pennsylvania has adopted Section 551 of the Restatement (Second) of Torts, which defines the limited circumstances under which the duty to speak arises between parties to a particular transaction. *Duquesne*, 66 F.3d at 611-12 (noting the general restrictions of fraudulent concealment liability to business transactions). Further, a duty to speak does not normally arise between the parties in the absence of a confidential or fiduciary relationship. *Daniel Boone Area School District v. Lehman Brothers, Inc*., 187 F. Supp. 2d 400, 408 (W.D. Pa. 2002).

Here, McCullough does not allege that her fraudulent concealment claim arises out of a transaction as interpreted by Pennsylvania law because McCullough does not claim to have participated in a transaction with Nissan itself. Instead, McCullough alleges only that she

purchased a certified pre-owned 2014 Nissan Altima from Fred Beans Nissan of Doylestown in Doylestown, Pennsylvania. Compl. ¶ 21. McCullough cites *Gray v. BMW of N. Am., LLC*, 2014 WL 4723161, at *6 (D.N.J. Sept. 23, 2014), to argue for a broader definition of "transaction" to encompass her relationship with Nissan. Oppo. 19. But in *Gray*, the court applied California law, not Pennsylvania law. 2014 WL 4723161 at *6 (discussing California's CLRA definition of "transaction"). *Gray* is inapplicable to McCullough's Pennsylvania law claim. As Pennsylvania has explicitly incorporated section 551 of the Restatement (Second) of Torts, which requires that a fraudulent concealment claim be limited to transactional relationships, McCullough fails to state a fraudulent omission claim under Pennsylvania law. Accordingly, I grant Nissan's motion to dismiss McCullough's fraudulent concealment claim.

## V.       PENNSYLVANIA BREACH OF IMPLIED WARRANTY CLAIM

Nissan argues that McCullough's breach of implied warranty claim fails because her vehicle was merchantable as a matter of law. Mot. 19-21. "An implied warranty of merchantability arises by operation of law and serves to protect buyers from loss where the goods purchased are below commercial standards." *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 887-88 (E.D. Pa. 1996) (citing 13 Pa.C.S.A. § 2314). "To be merchantable, goods need only be of reasonable quality within expected variations and 'fit for the ordinary purposes for which they are used.'" *Id.* at 888. Concerning cars, "the implied warranty of merchantability is simply a guarantee that they will operate in a 'safe condition' and 'substantially free of defects.'" *Id.* A car is generally considered merchantable if it "provide[s] safe, reliable transportation." *Id.* (quoting *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir.1989)).

McCullough alleges that "shortly after purchasing her vehicle [she] began to experience the CVT Defect, including: shaking and juddering while driving, an unusual buzzing noise while decelerating; and delayed [ ] engagement." FAC ¶ 22. On two occasions this "shaking and juddering" led to her vehicle stalling on the side of the road, which required that she have her car towed. *Id.* ¶¶ 23-24. "At all times, [she] has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used." *Id.* ¶ 25. I find that these allegations are sufficient to establish that McCullough's car did not provide her with either safe or particularly reliable

17

transportation.

Nissan contends that, as a matter of law, courts have consistently rejected implied warranty claims in instances where a car has been used for substantially less mileage than McCullough's vehicle. Mot. 15. The cases Nissan relies on are inapposite because the problems described in them arose long after the cars had been purchased, not shortly after the purchase as in McCullough's case. FAC ¶¶ 22-24. See, e.g., *Sheris v. Nissan N. Am. Inc.* 2008 WL 2354908, at *5 (D.N.J. June 3, 2008) (plaintiff could not bring a claim for breach of implied warranty because it was undisputed that the plaintiff had driven his car for 20,618 miles and for about two years before the alleged defect arose); *Szymczak v. Nissan N. Am., Inc.*, No. 10 CV 7493 VB, 2011 WL 7095432, at *1 (S.D.N.Y. Dec. 16, 2011) (of the named plaintiffs who experienced the alleged defect, the plaintiff who experienced it earliest had already driven approximately 52,000 miles on the automobile); *Ford Motor Co. v. Fairley*, 398 So. 2d 216, 217 (Miss. 1981) (the vehicle had been driven 26,649 miles); *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 624 (M.D.N.C. 2006) (the plaintiff does not appear to have alleged how many miles his vehicle had been driven but it was operational for at least two years, and the authorities cited by the *Bussian* court in denying the plaintiff's implied warranty claim featured vehicles driven between 26,649 miles and 90,000 miles before the alleged defects arose); and *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 171 (S.D. Miss. 1996) (of the named plaintiffs who experienced the alleged defect, the plaintiff who experienced it earliest had already driven 99,832 miles on his automobile)..

Given McCullough's allegations, I cannot conclude, as a matter of law, that her car was merchantable. *See Hornberger*, 929 F. Supp. at 888 (noting that a material question of fact exists where "[p]laintiffs allege that they did not receive that which they leased, i.e., an automobile substantially free of material defects"). Nissan's motion to dismiss Plaintiffs' Pennsylvania fraudulent omission claim is denied**.**

## VI. THE EXPRESS WARRANTY CLAIMS

Plaintiffs plead that the Powertrain Warranty covers all purchasers and lessees of class vehicles. FAC ¶¶ 94, 137, 179. The warranty covers "any repairs needed to correct defects in materials and workmanship [of covered parts]." *Id*. The Powertrain Warranty, which

encompasses the transmission, has a duration of 60 months or 60,000 miles, whichever occurs first. *Id*. Plaintiffs allege that the class vehicles—presumably all of them—"contain one or more design and/or manufacturing defects." *Id.* ¶ 2.

Nissan contends that plaintiffs' express warranty claims fail to allege that their vehicles contain a defect in "materials and workmanship" but instead allege a design defect, which is not covered by the Powertrain Warranty. Mot. 15-17. It is not clear from the FAC that plaintiffs have not alleged a manufacturing defect. Under California law, "[a] defect in the manufacture of a product exists if the product differs from the manufacturer's intended result or if the product differs from apparently identical products from the same manufacturer." Cal. Jury Instr. (BAJI) No. 9.00.3. "For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect." *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429 (1978). The classic example is "the one soda bottle in ten thousand that explodes without explanation." *Id.* at 428 (citing *Escola v. Coca Cola Bottling Co.*, 24 Cal. 2d 453 (1944)). On the other hand, a product is defective in design "if it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner," or "if there is a risk of danger inherent in the design which outweighs the benefits of that design." BAJI No. 9.00.5. Unlike a manufacturing defect, a design defect "cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design." *Barker*, 20 Cal. 3d at 429.

It is true that plaintiffs' allegations suggest that the defect occurs widely across all relevant models. *See, e.g.*, FAC ¶ 3 ("Numerous Class Vehicle owners have reported a significant delay in the Class Vehicle's response while attempting to accelerate from a stop or while attempting to merge into freeway traffic, or pass another vehicle, which requires the ability to accelerate quickly. This delay in response is typically accompanied with reports of the engine revving while the driver depresses the gas pedal without little to no increase in vehicle speed."). Nevertheless, I find that this is sufficient to plead a manufacturing defect.

While plaintiffs may not have alleged that the specific vehicles differ from identical ones

19

from Nissan, plaintiffs have plausibly alleged that these vehicles differ from the product the manufacturer intended to sell; Nissan could not have intended for the Class Vehicles to operate as described throughout the FAC. *See Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017). The numerous examples of the alleged CVT Defect in the FAC suggest that these vehicles came "off the assembly line in a substandard condition." *Barker*, 20 Cal. 3d at 429; *see also Falk v. Nissan N. Am., Inc.*, 2018 WL 2234303, at *2 (noting that "Plaintiffs have identified a number of symptoms that may be attributable to material or workmanship defects"). This could be due to a defect in manufacturing rather than a design defect. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1181 (C.D. Cal. 2010) ("[T]o the extent that Plaintiffs' breach of express warranty claim is based on allegations other than design defects, they are not barred as beyond the scope of the warranty on 'materials and workmanship.'"); *see also Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 467 (S.D.N.Y. 2014) ("Whether the[ ] alleged defects arose from a faulty design, faulty materials or faulty workmanship cannot be ascertained absent discovery, since any information concerning the true origin of the alleged defect is within the sole possession of the defendant.") (citations omitted).

The allegations here are unlike those in *Hindsman v. General Motors LLC*, 2018 WL 2463113, at *7 (N.D. Cal. June 1, 2018), where the plaintiff's allegations wholly centered on design decisions by General Motors. Here, plaintiffs allege symptoms that could be attributed to either a design or manufacturing defect and as a result, have pleaded facts sufficient to state a claim for breach of express warranty. Accordingly, I **DENY** Nissan's motion to dismiss plaintiffs' express warranty claims to the extent that plaintiffs seek relief under a manufacturing defect theory.

## VII. MAGNUSON-MOSS WARRANTY ACT CLAIMS

The Magnuson-Moss Warranty Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." *See* 15 U.S.C. § 2310(d)(1). Nissan argued for the

1   dismissal of plaintiffs' Magnuson-Moss Warranty Act claims on the assumption that plaintiffs had

2   not adequately pleaded any of its express or implied warranty claims.  As I have concluded that

3   plaintiffs' express warranty claims and McCullough's implied warranty of merchantability claim

4   survive, so do the plaintiffs' Magnuson-Moss Warranty Act claims.

5   **VIII.   THE JOINT STIPULATION TO EXTEND THE DEADLINE FOR PLAINTIFFS**

6   **TO AMEND OR ADD PARTIES**

7        Pursuant to the stipulation submitted by the parties on October 24, 2018 [Dkt. No 43], the

8   October 30, 2018 deadline for plaintiffs to amend or add parties shall be continued until 21 days

9   after the date of this ruling.

10                 **CONCLUSION**

11        For the reasons stated above, Nissan's motion is GRANTED as to plaintiffs' Pennsylvania

12   fraudulent omission claim, New York fraudulent omission claim, and Section 349 claim.  I DENY

13   Nissan's motion as to all other claims.  Plaintiffs have leave to amend within twenty days of the

14   date of this Order because it is possible that the identified deficiencies could be cured by the

15   allegation of other facts.

16        **IT IS SO ORDERED.**

17   Dated: October 26, 2018

18

19

20                     William H. Orrick
                          United States District Judge

21

22

23

24

25

26

27

28